UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GREGORY A. WASHINGTON,    )
    )
    Plaintiff,    )
    )    **No. 12-CV-06379**
    v.    )
    )    **Magistrate Judge Susan E. Cox**
MICHAEL J. ASTRUE,    )
Commissioner of Social Security,    )
    )
    Defendant.    )

## MEMORANDUM OPINION AND ORDER

Plaintiff Gregory Washington seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for Disability Insurance Benefits and Supplemental Insurance Income (collectively herein, "disability benefits") under the Social Security Act ("Act").[1] Mr. Washington seeks reversal of the Commissioner's final decision and a remand for an award of benefits, or in the alternative, reversal of the Commissioner's final decision and remand for additional proceedings. For the reasons set forth below, Mr. Washington's motion to reverse the Commissioner's final decision is granted [dkt. 25].

## I.    PROCEDURAL HISTORY

Mr. Washington filed an application for disability benefits on October 20, 2005, alleging he became disabled on February 15, 2004.[2] On August 31, 2007, after a hearing was held, Administrative Law Judge Marin Dougherty denied Mr. Washington's claims, stating Mr. Washington was not disabled because he could perform a significant number of jobs in the

---

[1] 42 U.S.C. §§ 416(I), 423, and 1381 *et seq.*
[2] R. at 187-189, 202-204.

1

national economy.[3] Mr. Washington filed a timely appeal, and on July 28, 2008, the Appeals Council denied his request for review.[4] Mr. Washington sought judicial review in the U.S. District Court for the Northern District of Illinois.[5]

On July 10, 2009, pursuant to a stipulation of the parties to remand, District Court Judge Blanche M. Manning entered an order remanding the matter back to the Commissioner.[6] On remand, the Commissioner was directed to re-evaluate Mr. Washington's residual functional capacity ("RFC"), the impact of his mental impairment, the combination of his impairments, re-assess his credibility, and obtain testimony from a vocational expert ("VE") based on Mr. Washington's revised assessment.[7]

On September 18, 2009, the Appeals Council, in turn issued, an order remanding Mr. Washington's case to Administrative Law Judge Daniel Dadabo ("ALJ").[8] Pursuant to that order, Mr. Washington appeared and testified, along with two medical experts and one VE, at a hearing on February 18, 2011.[9] On March 11, 2011, the ALJ issued a decision finding that Mr. Washington was not disabled because he could perform a number of jobs in the national economy.[10] The Appeals Council declined to exercise jurisdiction, leaving the ALJ's decision as the final decision of the Commissioner.[11] Mr. Washington filed a complaint in this Court seeking judicial review of the final decision of the Commissioner.[12]

---

[3] R. at 10; 90.
[4] R. at 1-3, 7-8.
[5] *Washington v. Astrue*, 08 C 5059.
[6] *Id.* at dkt. 30.
[7] *Id.*
[8] R. at 1051-52.
[9] R. at 989-1045.
[10] R. at 965-78.
[11] R. at 950-52.
[12] Dkt. 1.

## II.    BACKGROUND

At the time of the hearing, Mr. Washington was fifty years old and lived with mother and aunt.[13] His most recent work consisted of maintenance and janitorial services position in a condominium complex.[14] Prior to this position, Mr. Washington found jobs as a driver, custodian, dishwasher, and janitor through temporary employment services, as well as various positions with the City of Evanston's Park District.[15]

Since at least 2004 Mr. Washington has been treated for a wide variety of medical conditions including: anemia, fatigue, obesity, dyspnea,[16] pneumonia, chronic bronchitis, hypertension, type II diabetes,[17] diabetic retinopathy,[18] glaucoma, cataracts, diabetic neuropathy,[19] diabetic nephropathy,[20] difficulty bending, and edema[21]. Furthermore, Mr. Washington has been diagnosed with borderline intellectual functioning and a learning disability.[22]

### A.    Mr. Washington's Physical Health Records

Mr. Washington's medical records are extensive and therefore only the relevant portions are discussed below.

---

[13] R. at 995, 1002.
[14] R. at 41, 215.
[15] R. at 230-35, 1285.
[16] Dyspnea is shortness of breath. MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/003075.htm (last visited May 7, 2014).
[17] Diabetes is also referred to as diabetes mellitus. MedlinePlus, http://www.nlm.nih.gov/medlineplus/diabetes.html (last visited May 7, 2014).
[18] Diabetic retinopathy is damage to the blood vessels in the retina that causes vision loss and blindness. National Eye Institute: Facts About Diabetic Retinopathy, http://www.nei.nih.gov/health/diabetic/retinopathy.asp (last visited May 7, 2014).
[19] Diabetic neuropathy is a nerve disorder caused by diabetes that can cause problems with sensation in a person's feet. National Institute of Neurological Disorders and Strokes: Diabetic Neuropathy Information Page, http://www.ninds.nih.gov/disorders/diabetic/diabetic.htm (last visited May 7, 2014).
[20] Diabetic nephropathy is kidney damage caused by diabetes. MedlinePlus, http://www.nlm.nih.gov/medlineplus/diabetickidneyproblems.html (last visited May 7, 2014).
[21] Edema is swelling in the body caused by fluid. MedlinePlus, http://www.nlm.nih.gov/medlineplus/edema.html (last visited May 7, 2014).
[22] R. at 542, 1299.

The records show that prior to 2004, Mr. Washington had issues with gallstones, was hospitalized for pneumonia, edema, and hypertension, and complained of left shoulder pain.[23] In September of 2004, Bhupinder Singh, M.D. reported that Mr. Washington was limited to occasionally lifting no more than 20 pounds, could frequently lift up to ten pounds, and had full ability to perform physical activities of daily living.[24] At this time and through 2005, a physician at St. Francis Community Health Center prescribed Mr. Washington Zestroetic, Lipitor, ASA[25], Glucovance, Allupernt, Prednisone, and Zithremax.[26]

In March of 2005, Mr. Washington visited James H. McClure, M.D. for his diabetes.[27] Dr. McClure prescribed the following medications for the following problems: Ecotrine for blood clotting; Glyburide for diabetes; Lipitor for cholesterol; and Lisinpril for blood pressure.[28] In May of 2005, Mr. Washington visited Frank Rubin, M.D. at Evanston Eyes to receive vision testing.[29]

Mr. Washington went to see Aaron B. Weinberg, M.D. on August 26 and September 20, 2005 to receive vision exams.[30] Records note that the reason for the visit was that he had experienced loss in vision, although it is unclear which eye was tested.[31] Mr. Washington visited Evanston Health Clinic on October 3, 2005 for a check-up and to receive medication.[32] According to his "Disability Report – Adult – Form SSA-3368," Mr. Washington indicated that

---

[23] R. at 306-314, 345, 469-476.
[24] R. at 386
[25] ASA is not defined in the Record.
[26] R. at 373.
[27] R. at 216-17.
[28] R. at 220, 267.
[29] R. at 217.
[30] R. at 217, 221.
[31] *Id.*
[32] R. at 216.

he had seen two doctors as an outpatient at Cook County Hospital for examinations due to loss of vision in September and October of 2005.[33]

After complaining of eye trouble during visits at St. Francis and Cook County Hospitals, Mr. Washington went to see Doctors at the University of Illinois UIC Eye Center.[34] He was seen as a patient from October 27, 2005 to September 12, 2006, by Norman Blair, M.D.[35] On October 27, 2005, Dr. Blair diagnosed Mr. Washington with diabetic retinopathy with traction retinal detachment and vitreous hemorrhage and immature cataract in both eyes.[36] Dr. Blair noted that Mr. Washington had been suffering from substantial vitreous hemorrhage in the right eye for at least three months.[37] Mr. Washington had 20/40 vision in his left eye and testing showed retinal detachment in his right eye.[38]

On February 3, 2006, Mr. Washington had surgery on his right eye.[39] In March of 2006, Mr. Washington had an ultrasound done and was being treated for glaucoma.[40] On June 6, 2006, Mr. Washington received care from Benedito Carneiro, M.D. and Kelly Tan, M.D. for his diabetes and high blood pressure.[41] On September 4, 2006, Mr. Washington was admitted to the hospital for pneumonia.[42]

On May 20, 2007, a magnetic resonance imagining ("MRI") scan was performed to evaluate complaints of gait instability.[43] On June 5, 2007, Mr. Washington's vision was tested and he had no visual complaints. The visual acuity in his left eye was 20/30 with hand movement

---

[33] R. at 217-18.
[34] R. at 219-20.
[35] R. at 219-20, 249, 266.
[36] R. at 492-93.
[37] *Id.*
[38] *Id.*
[39] R. at 552-54.
[40] R. at 248-50.
[41] R. at 266.
[42] R. at 811.
[43] R. at 883-84.

in his right eye.[44]  On June 11, 2007, Mr. Washington's visual acuity in his left eye was 20/40 with hand movement in his right eye.[45]

From 2007 to 2008 Mr. Washington continued his treatment for diabetic retinopathy, cholesterol, anemia, type II diabetes, obstructive sleep apnea, and gait training.[46] In October of 2007, Dr. Tan suggested physical therapy for gait training and recommended he walk for 30 to 45 minutes per day.[47] In March of 2008, Mr. Washington had surgery on his left eye to repair a detached retina.[48] In November of 2008, Mr. Washington visited Evanston Hospital complaining of foot pain, and was diagnosed with plantar fascial fibromatosis and hallux limitus[49].  He was directed to wear over-the-counter orthotics, do calf stretches, and heel lifts. [50]

In January of 2008, Mr. Washington was diagnosed with chronic kidney disease.[51] In June of 2008, Mr. Washington received treatment for a chronic wound on his left leg as well as for edema on his lower legs.[52] Treatment included leg elevation, wearing a support stocking, and skin care.[53]

In 2009, Mr. Washington continued to be treated at Evanston Hospital for diabetes and chronic kidney disease. On April 15, 2009, Mr. Washington noted that he felt well, did not have

---

[44] R. at 897.
[45] R. at 905-06.
[46] R. at 1142-43.

[48] R. at 1245.
[49] Plantar fibromatosis and hallux limitus are both feet conditions that can cause pain and difficulty walking. American Foot & Ankle Society: Plantar Fibroma and Plantar Fibromatosis, http://www.aofas.org/footcaremd/conditions/ailments-of-the-heel/Pages/Plantar-Fibroma.aspx (last visited May 7, 2014); American College of Foot and Ankle Surgeons: Hallux Rigidus, http://www.foothealthfacts.org/footankleinfo/hallux-rigidus.htm?terms=Hallux%20limitus (last visited May 7, 2014).
[50] R. at 1189-90.
[51] R. at 1212.
[52] R. at 1231-32.
[53] R. at 1232.

chest pain or shortness of breath, and was walking more.[54] On January 4, 2010, Mr. Washington had surgery for the glaucoma in his right eye.[55]

On December 23, 2010, Mr. Washington was admitted to emergency care at Northshore University Health System for flu-like symptoms and pneumonia.[56] The records from his hospital stay indicate that Mr. Washington suffered from stage III chronic kidney disease, hypertension, shortness of breath, diabetes, obstructive sleep apnea, high cholesterol, anemia, and diabetic retinopathy.[57]

On June 14, 2010, Mr. Washington was seen by Jonathan G. Lippitz, M.D. at Northshore University Health Systems as a walk-in for shoulder pain.[58] Mr. Washington reported that he had hurt his shoulder helping someone move one month earlier.[59]

On November 15, 2010, Roopa K. Karri, M.D. performed a consultative exam on Mr. Washington for the Bureau of Disability Determination Services.[60] Dr. Karri noted that Mr. Washington could not see at all out of his right eye and that his visual acuity in his left eye was 20/70.[61] In addition, Dr. Karri wrote that Mr. Washington had poor depth perception due to his right eye blindness and very poor vision in his left eye.[62] Dr. Karri measured Mr. Washington's edema at 1+ and observed that Mr. Washington could walk fifty feet without support.[63] His grip strength was normal, as was his range of motion of his shoulders, elbows, and wrists.[64]

Regarding Mr. Washington's neurological response, Dr. Karri noted that he had

---

[54] R. at 1208.
[55] R. at 1264.
[56] R. at 1325-26.
[57] *Id.*
[58] R. at 1442.
[59] *Id.*
[60] R. at 1302-12.
[61] R. at 1304.
[62] R. at 1305, 1310.
[63] R. at 1304.
[64] R. at 1304-05.

"sustained, audible and understandable speech" and that the strength in his upper and lower limbs was 5/5.[65] Dr. Karri determined that Mr. Washington could lift twenty-one to fifty pounds frequently and fifty-one to one hundred pounds occasionally.[66] Mr. Washington could carry eleven to twenty pounds frequently and twenty-one to fifty pounds occasionally.[67] Dr. Karri opined that Mr. Washington could sit uninterrupted for eight hours, stand uninterrupted for one hour, and walk uninterrupted for one hour.[68] In an eight hour period, Dr. Karri concluded that Mr. Washington could sit for eight hours or stand for four hours and walk for four hours.[69]

Dr. Karri found that Mr. Washington could continuously reach with both hands, perform handling, pushing and pulling, and frequently perform fingering and feeling. Dr. Karri did note that Mr. Washington had occasional tingling in his hands.[70]

In regards to the operation of foot controls, Dr. Karri concluded that Mr. Washington could operate them on a frequent basis with both of his feet, but he had occasional tingling.[71] In regard to postural activities, Dr. Karri found that Mr. Washington could not climb ladders, scaffolds, or perform activities that required him to balance. Mr. Washington could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl.[72]

Dr. Karri stated that Mr. Washington had "diabetic retinopathy with laser surgeries on both eyes causing blindness in right eye and poor vision in left eye."[73] Given Mr. Washington's visual impairment, Dr. Karri opined that he was unable to read very small print, ordinary newspaper or book print, and was unable to view a computer screen. Despite this conclusion, she

---

[65] R. at 1305.
[66] R. at 1307.
[67] *Id.*
[68] R. at 1308.
[69] *Id.*
[70] R. at 1309.
[71] *Id.*
[72] R. at 1310.
[73] *Id.*

believed that he was able to avoid ordinary hazards in the workplace and could determine differences in shape and color of small objects.[74]

In regard to environmental limitations, Dr. Karri concluded that Mr. Washington could never tolerate exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle. She found that he could occasionally tolerate exposure to dust, odors, fumes and pulmonary irritants, extreme cold and extreme heat. He could frequently tolerate exposure to loud noise and vibrations.[75]

Physically, Dr. Karri found Mr. Washington able to shop, travel without a companion for assistance, ambulate without assistance, walk a block, use public transportation, climb a few steps with handrail assistance, prepare a simple meal and feed himself, and care for his personal hygiene. She found him not capable of sorting or handling paper files due to his poor vision.[76]

Subsequent to Dr. Karri's evaluation, on November 19, 2010, Mr. Washington was examined by Felix Chau, M.D. an ophthalmologist with the City of Evanston. Dr. Chau stated that Mr. Washington was not capable of full-time employment due to poor vision in the right eye and difficulty with reading in his left eye.[77]

### B.      Mr. Washington's Mental Health Records

A psychological assessment of Mr. Washington was performed on May 20, 2010 by Dr. Mark B. Langgut, Ph.D., a licensed clinical psychologist. Dr. Langgut observed that Mr. Washington had a "friendly, immature, and regressed presentation. He was cooperative and

---

[74] *Id.*
[75] R. at 1311.
[76] R. at 1312.
[77] R. at 1323.

responded adequately…He was oriented to time, place, and person."[78]  Mr. Washington informed Dr. Langgut that he received special education services while in school.[79]

Additionally, Mr. Washington explained his issues with substance abuse, noting his arrest in 1993 for driving while intoxicated.[80] Mr. Washington admitted to occasionally drinking alcohol at the present time, to using marijuana from age fifteen to forty-two, and stated that he occasionally smoked cigarettes.[81] Under "social functioning," Dr. Langgut noted that Mr. Washington stated he "sleeps adequately well" and during the day he "watches TV, exercises, and walks." He stated he "helps neighborhood children 'get on the bus.'"[82] Regarding his mental status, Dr. Langgut stated Mr. Washington was "irritable but cooperative…presented with mild depression, ranking at two on a one-to-ten scale with one indicating minimal sadness and ten being indicative of the most extreme depression."[83] Dr. Langgut wrote that Mr. Washington "needs external structure. His anxiety appeared within normal limits...Mr. Washington's emotional presentation appeared within normal limits, while by report it is variable…no behavioral abnormalities were observed."[84]

Dr. Langgut found Mr. Washington to have "variable memory skills" as well as "limited computational skills."[85] He stated that Mr. Washington "may have significant difficulty with forming generalizations and understanding concepts, and he may become frustrated when faced with these types of tasks."[86] After administering standardized tests, Dr. Langgut concluded that

[78] R. at 1284.
[79] R. at 1285.
[80] *Id.*
[81] *Id.*
[82] R. at 1286.
[83] *Id.*
[84] *Id.*
[85] *Id.*
[86] R. at 1287.

Mr. Washington had a Full Scale IQ score of 67, which indicated that he was "functioning in the mentally deficient or extremely low range."[87]

Dr. Langgut filled out the "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" and indicated that Mr. Washington had the "ability to understand, remember and carry out instructions…"[88] Dr. Langgut further indicated that Mr. Washington had a mild restriction in his ability to understand, remember, and carry out simple instructions; a moderate restriction in his ability to make judgments for simple work-related decisions; and marked restrictions in understanding, remembering, and carrying out complex instructions, and the ability to make judgments for complex work-related decisions.[89]

Further, Dr. Langgut believed that Mr. Washington's ability to interact appropriately with supervisors, co-workers, and the public was affected by his impairment.[90] Dr. Langgut indicated that Mr. Washington had mild restrictions in interacting with the public; moderate restrictions interacting with supervisors and co-workers; and marked restrictions in responding to usual work situations and changes in a routine work setting.[91] Dr. Langgut did not note any additional impairments, but did mention Mr. Washington's history of alcohol abuse and self-reported denial of current or recent abuse of alcohol or cannabis.[92]

Joan F. Hakimi, Psy.D., also a licensed clinical psychologist, performed a second psychological examination of Mr. Washington for the Bureau of Determination Services on November 15, 2010.[93] Dr. Hakimi determined that Mr. Washington had fair general knowledge,

---

[87] R. at 1288.
[88] R. at 1290.
[89] R. at 1290.
[90] R. at 1291.
[91] *Id.*
[92] *Id.*
[93] R. at 1314-21.

poor judgment and problem solving, and that his capacity for abstract thinking varied.[94] In her report, Dr. Hakimi wrote that Mr. Washington's mental status was "alert and [he was] oriented to time, place and person," and that "[h]e understood the purpose of the evaluation and was fully attentive."[95] Regarding Mr. Washington's thought content, Dr. Hakimi concluded that he had "logical and sequential" thought processes and that he maintained his attention and concentration during the evaluation.[96] Under the heading "Attention and Concentration," Dr. Hakimi noted that Mr. Washington was able to say the months of the year forward and backward "with no difficulty."[97]

Dr. Hakimi's review and assessment also considered that Mr. Washington had diabetes that went untreated for twenty years and that it was the cause of his difficulties with his eyesight, heart, and kidneys.[98] She found no evidence of a formal thought disorder or a mood disorder.[99] Dr. Hakimi believed that the results of her exam were "an accurate reflection of claimant's current level of functioning, consistent with his history and education level."[100]

Dr. Hakimi also filled out a "Medical Source Statement of Ability To Do Work-Related Activities (Mental)" form. Contrary to Dr. Langgut's answer, she answered "no" to the question "is the ability to understand, remember and carry out instructions affected by the impairment?"[101] She repeated her opinion that Mr. Washington's impairment did not affect his ability to interact appropriately with supervisors, co-workers, and the public, or respond to

---

[94] R. at 1317.
[95] R. at 1316.
[96] *Id.*
[97] *Id.*
[98] R. at 1317.
[99] R. at 1318.
[100] R. at 1317.
[101] R. at 1319.

changes in a routine work setting.[102] Dr. Hakimi noted that Mr. Washington's visual capabilities were affected by his impairments, and that he reported tingling in his hands and feet.[103]

### C.    The Hearing

On February 18, 2011, a hearing was held pursuant to the Appeals Council's remand order.[104]  Pursuant to that order, the purpose of the hearing was to re-evaluate Mr. Washington's residual functional capacity, the impact of his mental impairment, the combination of his impairments, re-assess his credibility, and obtain testimony from a vocational expert based on Mr. Washington's revised assessment.[105] Mr. Washington testified and was represented by an attorney, Cody Marvin.[106]  Two independent medical experts testified, Hilda K. Martin, M.D. and Kennise Herring, Ph.D.  Dr. Martin is a board certified internist and pulmonologist and Dr. Herring is a licensed clinical psychologist.[107] Michelle Peters, a VE, also testified.

At the beginning of the hearing, the ALJ noted that Mr. Washington had submitted additional documents that the medical experts were unable to review. Mr. Marvin noted that none of the documents had to do with Mr. Washington's psychological condition and was willing to proceed with the hearing.[108] There were no other objections with respect to the documents submitted and the exhibits that were marked and received into evidence.[109]

Mr. Washington testified that he was fifty years old at the time of the hearing and the furthest that he had gone in school was high school.[110] He stated that he completed a semester

---

[102] R. at 1320.
[103] *Id.*
[104] R. at 989, 1051-52.
[105] R. at 1051-52.
[106] R. at 989.
[107] R. 991, 972.
[108] R. 992.
[109] R. at 994.
[110] R. at 995

and a half of college.[111] When asked why he could not work, Mr. Washington testified that he was limited by his "vision and other impairments." [112] Mr. Washington identified these impairments as chronic kidney disease, issues with his legs, his heart, and glaucoma in his right eye.[113]

First, the ALJ focused on Mr. Washington's issues with his vision. Mr. Washington stated that he could read a newspaper, but only if the font was large and that he would really have to focus to read the menu at McDonald's.[114] Mr. Washington also testified that he took courses at Oakton Community College when he was able to drive, but that was thirty years ago from 1979 to 1980.[115] Later in his testimony, Mr. Washington testified that he could read his blood sugar number on his machine, so long as he brings it close to his face to see it.[116] Mr. Washington also testified that he does not have a problem taking public transportation, so long as he is going somewhere that he has already been before.[117]

Next, the ALJ addressed Mr. Washington's issues with his legs and his contention that he needed to keep his legs elevated. Mr. Washington testified that he has needed to elevate his legs for the last three years, but that he had recently raked leaves and shoveled the snow. [118] Mr. Washington stated that he only raked leaves for fifteen minutes.[119] He shoveled snow for about an hour and a half, but used a snow blower.[120] When asked what his limitation would be for a job that required Mr. Washington to pick up towels, empty light trash, dust, or lift ten to fifteen

---

[111] R. at 995.
[112] R. at 996.
[113] R. at 998.
[114] R. at 996.
[115] R. 997-98.
[116] R. at 1001.
[117] R. at 1002.
[118] R. at 998-99.
[119] R. at 999.
[120] R. at 1006.

pounds, Mr. Washington stated that he would not be able bend over and that this has been a problem for the last two years.[121]

    When asked how far he could walk, Mr. Washington testified that he could walk thirty blocks in about two and half hours.[122] He stated that he has to stop at least three to four times to catch his breath.[123] Mr. Washington also testified that he can go shopping alone, but did not specify a length of time.[124] When asked more specifically about the issues with his legs and feet, Mr. Washington stated that his legs and feet swell and that he has pain and arthritis in his feet.[125] Mr. Washington also mentioned an ulcer on his right ankle that he had to have a skin graft for in 1986.[126]

    Mr. Washington was then questioned by his attorney, Mr. Marvin. Mr. Marvin asked Mr. Washington about his anemia and fatigue.[127] Mr. Washington responded that he needed to rest at least an hour during the day.[128] He also testified that he gets tingling and numbness in his hands, feet, and toes at least twice a month, but could not say how long each episode lasted.[129] Mr. Washington ended his testimony by discussing how he needs to take breaks to catch his breath when he is doing things like shoveling snow.[130]

    After Mr. Washington testified, Dr. Martin, one of the independent medical experts, was questioned.[131] Dr. Martin testified that Mr. Washington's impairments which caused more than a

---

[121] R. at 1000.
[122] R. at 1002-03.
[123] R at 1002.
[124] R. at 1003.
[125] R. at 1004.
[126] R. at 1005.
[127] R. at 1007.
[128] *Id.*
[129] R. at 1007-08.
[130] R. at 1009.
[131] R. at 1010.

minimal impact upon functioning were: diabetes, retinopathy, nephropathy, and neuropathy.[132] Dr. Martin then discussed each impairment.[133]

With respect to Mr. Washington's retinopathy, Dr. Martin qualified her statements by saying that she was not an ophthalmologist, but based on Mr. Washington's medical records it seemed as if he had "no vision or just hand motion in the right eye."[134] In regards to his nephropathy, Dr. Martin noted that his records indicated that he had kidney damage, but that it was "not that bad."[135] Dr. Martin did not believe that Mr. Washington's nephropathy caused him any medical limitations.[136] During cross-examination, it was unclear to Dr. Martin whether Mr. Washington's medical records indicated his vision was 20/40, 20/70, or 20/90.[137] At this point in the hearing, the ALJ agreed to assume that Mr. Washington "can't do fine visual acuity," but was unwilling to assume that he could not walk on his own or navigate street traffic.[138]

Next, Dr. Martin discussed Mr. Washington's neuropathy and his allegations of numbness and tingling. Dr. Martin stated that these allegations "were difficult to demonstrate on physical exam" and that the tests used to measure these issues came back normal.[139] Dr. Martin also did not believe there was medical evidence to support the severity of Mr. Washington's alleged problems with swelling or edema.[140] On-cross examination, Dr. Martin stated that the evidence of edema and swelling in the record indicated that Mr. Washington may need to elevate his feet at the end of a work day for thirty minutes.[141]

---

[132] R. at 1011.
[133] Id.
[134] Id.
[135] R. at 1012.
[136] R at 1013.
[137] R. at 1020.
[138] Id.
[139] R. at 1013-14
[140] R. at 1021.
[141] R. at 1023

She also commented that Mr. Washington's anemia and any issues with shortness of breath were not severe or chronic.[142] Dr. Martin did believe that Mr. Washington's anemia could cause his fatigue, but still did not believe it to be a significant impairment in light of his exercise tolerance.[143]

Dr. Martin concluded that the combination of Mr. Washington's impairments did not equal a listed impairment and his RFC should be "twenty pounds occasionally, ten pounds frequently, six hours stand and walk, six hours sit, no foot controls."[144] Dr. Martin also suggested no unprotected heights, heavy equipment or operating machinery, no extreme temperatures or environments, no dust, fumes, or odors as additional imitations.[145]

Dr. Herring, the second independent medical expert, testified next. Dr. Herring began her testimony by stating that there was no evidence in the record of any severe mental impairments and that any suggested mental impairments were due to Mr. Washington's testing anxieties.[146] Dr. Herring went on to explain that this conclusion was supported by the fact that, during the hearing, Mr. Washington was able to recall specific details about events that occurred in the 1980s and 1990s and Mr. Washington did not exhibit any perceptual or concentration problems.[147] Dr. Herring noted that testing showed that Mr. Washington suffered from mild dysphoria and depression, but that these did not support the finding of an organic impairment.[148] Dr. Herring also noted that there was no evidence that Mr. Washington's previous alcohol abuse impacted his cognitive abilities.[149]

---

[142] R. at 1015-17, 1023.
[143] R. at 1024.
[144] R. at 1017-18.
[145] R. at 1019.
[146] R. at 1025, 1029.
[147] R. at 1026.
[148] *Id.*
[149] *Id.*

The ALJ then questioned Dr. Herring about the conclusions drawn by Dr. Hakimi and Dr. Langgut.[150] Dr. Herring agreed with the ALJ that Dr. Hakimi's and Dr. Langgut's conclusions were inconsistent with one another and that Dr. Langgut's conclusion was inconsistent with the evidence that had been presented at the hearing.[151] Dr. Herring testified, "I believe Dr. Hakimi and what we heard today."[152]

Dr. Herring discredited Mr. Washington's IQ score of 67, which was reported by Dr. Langgut, because at the hearing Mr. Washington showed the ability to function well, articulated his position clearly, had the capacity for abstract reasoning, and to interact socially.[153] Dr. Herring also commented that she did not see any evidence of Mr. Washington being immature as stated in Dr. Langgut's report.[154]

On cross-examination, Mr. Marvin asked Dr. Herring whether Mr. Washington's early school reports showed evidence of cognitive problems, to which Dr. Herring answered that it did not.[155] Dr. Herring based her conclusion on that fact although Mr. Washington did not do well in high school; he did enroll in a post-secondary education program which showed he had motivation.[156] Mr. Marvin then attempted to question Dr. Herring about a MRI scan of Mr. Washington's brain.[157] Dr. Herring answered that she was not competent to read and interpret such a scan because she was not a neuropsychologist.[158]

---

[150] R. at 1027.
[151] R. at 1028.
[152] *Id.*
[153] R. at 1030.
[154] *Id.*
[155] R. at 1032
[156] *Id.*
[157] R. at 1033.
[158] *Id.*

Michelle Peters, the VE, testified last.[159] Ms. Peters stated that there was nothing in Mr. Washington's work history that rose to the level of substantial gainful activity.[160] The ALJ asked Ms. Peters whether there were positions for someone with the following limitations: work that is learnable on short demonstration, light functional capacity, not around unprotected heights, no heavy equipment, no operating machinery, no extreme temperatures, no excessive dust or fumes, is not in direct sunlight, no slippery or uneven surfaces, and no foot controls.[161] Based on these limitations, Ms. Peters stated that the positions available to such a person would be assembler, hand packager, and sorter positions.[162]

Next, the ALJ added the limitation of no fine visual acuity.[163] Ms. Peters stated that the type of positions available would not change, but that the number of possible positions would decrease.[164] The ALJ added the additional limitation of the need to elevate one's legs for several hours a day.[165] Ms. Peters testified that this limitation would eliminate all substantial gainful activity.[166] The ALJ added another limitation of being limited to working at your own pace.[167] Again, Ms. Peters testified that this would eliminate all substantial gainful activity.[168]

Finally, the ALJ asked whether requiring the assistance of others to correct mistakes or finish work would impact the available positions.[169] Ms. Peters testified that this limitation

---

[159] R. at 1036.
[160] *Id.*
[161] *Id.*
[162] R. at 1037.
[163] *Id.*
[164] R. at 1038.
[165] *Id.*
[166] *Id.*
[167] R. at 1039.
[168] *Id.*
[169] R. at 1040.

would also preclude any of the available positions because it would not be consistent with competitive employment.[170]

The ALJ concluded his examination of Ms. Peters by inquiring into the number of days Mr. Washington could miss from work and whether any of the positions required bending.[171] Ms. Peters testified that Mr. Washington would only be permitted to miss one to two days a month of work and that the positions she mentioned required frequent bending.[172]

On cross-examination, Ms. Peters admitted that Mr. Washington would be precluded from holding any of the positions she mentioned if he was required "to hold objects next to his face in order to see them properly."[173] She also testified that she defined "fine visual acuity" as the "ability to read or visualize site of smaller print objects."[174] When questioned about the limitation of only being able to stand or walk for four or two hours out of the day, Ms. Peters testified that such a limitation would only impact the number of jobs available.[175] The ALJ concluded the hearing by confirming that there were "many thousands" of jobs "in the several regions of the United States" that Mr. Washington could perform with the limitations offered by the ALJ and Mr. Marvin in their hypothetical questions.[176]

### D. THE ALJ'S DECISION

On March 11, 2011, the ALJ issued a decision finding that Mr. Washington was not disabled because, although Mr. Washington could not perform his past relevant work, there were other jobs in the national economy that he could perform.[177] In coming to this conclusion, the ALJ went through the requisite five-step sequential analysis in determining whether Mr.

---

[170] Id.
[171] R. at 1040-41.
[172] Id.
[173] R. 1041-42.
[174] R. 1041.
[175] R. at 1042.
[176] R. at 1044.
[177] R. 965-78.

Washington was disabled.[178] The ALJ incorporated the previous decision of ALJ Dougherty, except for her specific findings and conclusions.[179] The ALJ also noted that the District Court's remand order required him to specifically consider Mr. Washington's mental impairments using the technique found in 20 C.F.R. 404.1520a(c) and 416.920a(c), re-evaluate Mr. Washington's RFC, and to obtain additional testimony from a VE.[180]

The five-step sequential analysis required the ALJ to determine: (1) whether Mr. Washington was engaging in substantial gainful activity; (2) whether Mr. Washington had a severe impairment or a combination of impairments that is severe; (3) whether Mr. Washington's impairments meet the criteria of an impairment listed in the SSA regulations; (4) Mr. Washington's RFC and whether he can perform his past relevant work; and (5) if Mr. Washington cannot perform his past relevant work than whether he can perform any other work.[181]

The ALJ's first step is to determine whether the claimant is presently engaged in substantive gainful activity.[182] In the present case, the ALJ determined that Mr. Washington had not engaged in substantial gainful activity since February 15, 2004, the alleged onset date.[183]

At the second step the ALJ must decide whether the claimant has a severe impairment or combination of impairments.[184] Here, the ALJ found that Mr. Washington had the following severe impairments: borderline intellectual functioning ("BIF"), diabetes, diabetic retinopathy involving right eye blindness and left eye glaucoma with status post laser photo emulsification and vitrectomy, diabetic neuropathy, hypertension, moderate stage three chronic kidney disease,

---

[178] *Id.*
[179] R. at 965.
[180] *Id.*
[181] 20 C.F.R. §§404.1520(a), 416.920(a).
[182] 20 C.F.R. §§ 404.1520(b), 416.920(b).
[183] R. at 967.
[184] 20 C.F.R. §§ 404.1520(c), 416.920(c)

level II obesity, status post remote 1986 right ankle skin graft, and polysubstance abuse in remission.[185] The ALJ concluded that Mr. Washington's anemia, chronic bronchitis, and sleep apnea were non-severe impairments.[186]

At the third step the ALJ is required to determine whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in the regulations.[187] If the requirements of a listing are met then then a finding of disabled is entered.[188] The ALJ determined that Mr. Washington's impairments did not meet or medically equal a listed impairment in the Social Security Regulations.[189] Specifically, the ALJ found that Mr. Washington did not meet or equal a listed impairment in "section 12.02 (organic brain injury), section 12.05C (intellectual disability), section 9.08 (diabetes) or section 2.02 (vision loss)."[190] The ALJ also discussed that the requirements of listing 12.09 had not been met.[191]

Listing 2.02 requires "remaining vision in the better eye after best correction of 20/200 or less," and listing 9.08[192] requires a diagnosis of diabetes and neuropathy.[193] The ALJ concluded that the requirements of listings 2.02 (visual loss) and 9.08 (diabetes) were not shown because there was no evidence that Mr. Washington had a "sustained disturbance of gross and dexterous movements, gait or station," and because the vision in his left-eye was consistently measured at 20/40.[194]

Listing 12.09 requires a showing of "behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system" and the changes must

---

[185] R. at 968.
[186] *Id.*
[187] 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926.
[188] 20 C.F.R. §§ 404.1509, 416.909.
[189] R. at 968.
[190] R. at 968-70.
[191] R. at 696.
[192] Listing 9.08 has since been revised and consolidated to the current listing 9.00.
[193] 20 C.F.R. Pt. 404, Subpt. P, App 1 §§ 2.02, 9.08.
[194] R. at 968.

be severe enough to meet one of nine listings, one of which is listing 12.02.[195] Paragraph C of listing 12.02 requires a showing that the claimant is unable "to do basic work activities" and cannot function "outside a highly supportive living arrangement."[196] With respect to the criteria found in these listings, the ALJ found that they were not met because Mr. Washington was able to perform "his own activities of daily living independently."[197] The ALJ pointed to the evidence which showed Mr. Washington helped with household chores, was able to go to his doctor appointments alone, walk thirty blocks, and take public transportation alone.[198]

The ALJ spent most of his discussion on whether the paragraph B criteria of listing 12.05 (now paragraph D criteria of listing 12.05) was met. Paragraph B requires that the mental impairment cause at least two of the following restrictions: (1) marked restriction in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; (4) or repeated episodes of decompensation of an extended duration.[199] A marked restriction is more than moderate, but less than extreme.[200]

The ALJ found that Mr. Washington had a mild restriction in activities of daily living, mild difficulties in social functioning, moderate difficulties in concentration, persistence, or pace, and no episodes of decompensation of an extended duration.[201] Therefore, the ALJ concluded that Mr. Washington did not meet the listing because he did not have two "marked" restrictions.[202] Even though these limitations were not enough to meet the listing criteria, the

---

[195] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.09.
[196] *Id.*
[197] R. at 969.
[198] *Id.*
[199] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.
[200] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.
[201] R. at 969.
[202] *Id.*

ALJ noted that he would consider these restrictions in his RFC analysis at steps four and five of the sequential analysis.[203]

The ALJ also looked at paragraphs A, B, and C of listing 12.05 to determine whether these criteria were satisfied.[204] The ALJ concluded that Mr. Washington did not meet paragraph A because he was able to care for himself independently.[205] The ALJ used the same explanation for why Mr. Washington did not satisfy paragraph B's criteria, even though paragraph B requires "a valid verbal, performance, or full scale IQ of 59 or less."[206]

In regards to paragraph C of listing 12.05, that paragraph requires a "full scale IQ score of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[207] The ALJ credited Mr. Washington's IQ score of 67, but stated that the listing requirements were not met because "the evidence fails to demonstrate significant deficits in adaptive functioning as required in order to satisfy the listing."[208]

When no impairments are found to meet the criteria of an SSA listing, the ALJ proceeds to the fourth step. At the fourth step, the ALJ determines whether the claimant is able to perform his past relevant work.[209] This involves evaluating the claimant's RFC based on the record and his testimony and comparing it to the requirements of his past work.[210] A claimant's RFC is defined as the most he can do despite his impairments.[211]

---

[203] R. at 970.
[204] *Id.*
[205] *Id.*
[206] *Id.*
[207] *Id.*
[208] *Id.*
[209] 20 C.F.R. §§ 404.1520(f), 416.920(f).
[210] 20 C.F.R. §§ 404.1520(e), 416.920(e).
[211] 20 C.F.R. § 404.1545.

If determining a claimant's RFC requires the ALJ to assess subjective complaints of symptoms, then the ALJ follows a two-step process.[212] First, the ALJ determines whether the claimant's impairments could reasonably be expected to produce the claimant's symptoms, based on the medically acceptable evidence.[213] Second, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms on his ability to do basic work activities.[214] If the medical evidence does not support the claimant's statements regarding intensity, persistence, or limiting effects, then the ALJ must make a credibility determination.[215] After this process, if the ALJ finds that the claimant's RFC allows him to perform his past work, the claimant is not disabled.[216]

In the present case, the ALJ found that Mr. Washington's impairments "could reasonably be expected to cause the alleged symptoms," but found that Mr. Washington's statements regarding their intensity, persistence, and limiting effects were "not credible to the extent they are inconsistent with the above residual functional capacity assessment."[217] In coming to this conclusion, the ALJ analyzed the medical evidence and resolved what he saw as inconsistencies between the various medical experts. In regards to Mr. Washington's credibility, the ALJ stated that he found Mr. Washington's statements not credible because they were not consistent with the medical evidence, Mr. Washington's own testimony, and Mr. Washington's appearance and demeanor at the hearing.

The ALJ "accorded substantial weight" to the independent medical experts present at the hearing, Dr. Martin and Dr. Herring, noting that they "provided adequate and well-reasoned

---

[212] 20 C.F.R. § 404.1529.
[213] 20 C.F.R. § 404.1529(b).
[214] 20 C.F.R. § 404.1529(c).
[215] 20 C.F.R. § 404.1529(c).
[216] 20 C.F.R. § 404.1520(a).
[217] R. at 971.

bases of their opinions."[218] The ALJ relied on Dr. Martin's conclusions that Mr. Washington suffered from diabetic retinopathy, diabetic nephropathy that does not cause uremia, stage III chronic renal disease, had 20/40 vision in his left eye, and a mild limitation from lower extremity edema.[219] The ALJ also credited Dr. Martin's conclusions that Mr. Washington did not have diabetic neuropathy, had normal monofilament testing, and that he did not have any heart related issues.[220] The ALJ credited Dr. Martin's opinion in these areas because he found that it was consistent with the medical evidence in the record.[221]

Dr. Martin's conclusion that Mr. Washington suffered from diabetic retinopathy was supported by an October 2005 doctor's report showing a diagnosis for the same.[222] The ALJ found that this October 2005 report also supported Dr. Martin's opinion that Mr. Washington's vision was 20/40 in the left eye and getting better.[223] Finally, the ALJ cited the results of Dr. Martin's examination of Mr. Washington that showed Mr. Washington could walk fifty feet unassisted, had an unimpaired grip, and normal sensation.[224]

After discussing Dr. Martin's conclusions, the ALJ discussed Dr. Herring's conclusions. The ALJ noted that Dr. Herring's opinion corresponded with Dr. Martin's because Dr. Herring also "discounted the probability that the claimant met or equaled Listing 12.02 due to organic brain damage."[225] However, the ALJ noted that Dr. Herring was not a neuropsychologist and could not evaluate Mr. Washington's 2007 MRI which showed white brain matter changes.[226] Nonetheless, the ALJ credited Dr. Herring's conclusion that Mr. Washington did not have a

---

[218] R. at 972.
[219] Id.
[220] Id.
[221] Id.
[222] Id.
[223] Id.
[224] R. at 973.
[225] Id.
[226] Id.

perceptual disturbance, a thought disorder, or diminished concentration.[227] Dr. Herring based her conclusions on her own perception of Mr. Washington and an examination report from Dr. Hakimi.[228] Dr. Hakimi's report stated that Mr. Washington was able to recall numbers, what he did the day before, what he ate before coming to the appointment, how he got to the appointment, his birthdate, address, telephone number, and was able to remember three objects after three and five minute intervals.[229]

The ALJ then turned to what Dr. Herring considered a conflict between Dr. Hakimi's and Dr. Langgut's evaluations and conclusions.[230] Essentially, Dr. Hakimi's evaluation demonstrated that Mr. Washington could do simple tasks, whereas Dr. Langgut's conclusion was that Mr. Washington had borderline working memory and processing speed.[231]

The ALJ noted that Dr. Langgut's testing found that Mr. Washington had "variable memory skill,"[232] and then accepted Dr. Herring's opinion that this finding was due to Mr. Washington's anxiety.[233] The ALJ stated that Dr. Herring "did not regard these results as predictive of the claimant's capacity for simple work" and that "borderline memory impairment would not be expected to affect his ability to attend work throughout the course of a work day."[234] The ALJ further discredited Dr. Langgut's conclusions because in December of 1978, Mr. Washington's IQ score was 79 and Dr. Langgut's testing did not include any evidence of "an organic brain damage element that would account for such a significant decline in intellectual functioning."[235] In all, the ALJ agreed with Dr. Herring's findings that Dr. Hakimi's evaluation

---

[227] *Id.*
[228] *Id.*
[229] R. at 1316
[230] R. at 973.
[231] *Id.*
[232] R. at 1238.
[233] R. at 973, 1030.
[234] *Id.*
[235] R. at 974.

"seemed more representative of the claimant's actual capacity to attend the demands simple work."[236]

The ALJ next discussed what he believed to be discrepancies in Mr. Washington's testimony and previous statements he had made regarding his physical limitations.[237] First, the ALJ pointed out that Mr. Washington claimed difficulties with balance, his extremities, and sight, but acknowledged that he did not need a cane or an assistive device and was able to climb a flight of stairs.[238] Mr. Washington also stated that he "used a snow blower to remove snow for 1-1/2 hours…."[239] Mr. Washington admitted he can "carry small packages, has shoveled snow in 20 minute intervals…though he asserts resulting shortness of breath and fatigue."[240] Mr. Washington stated that "on a 'good day' he can mop and rake leaves for 15 minutes, again acknowledging that he shoveled snow as well."[241]

Second, Mr. Washington asserted that he must elevate his leg throughout the entire day due to alleged symptoms including swelling, but testified that "he walks from his home to Evanston Hospital, a 20 block walk taking 2.5 hours, asserting that he stops 3-4 times to catch his breath."[242] He also complained of tingling in his fingers and toes, but "indicated that this only occurs twice per month and he could not describe how long the symptoms last, lacking the specificity to otherwise make his allegations more convincing."[243]

Third, the ALJ found inconsistencies with Mr. Washington's testimony regarding his difficulty with his eye sight. Mr. Washington stated he had some difficulty reading numbers on

---

[236] *Id.*
[237] *Id.*
[238] *Id..*
[239] *Id.*
[240] *Id.*
[241] *Id.*
[242] R. at 975.
[243] *Id.*

public transportation vehicles, but "otherwise acknowledge[d] taking public transportation."[244] Mr. Washington noted that he could "read a newspaper when the print is big and bold rather than fine print."[245] In addition, the ALJ noted that Mr. Washington told a field office employee that he could not see through his right eye, but "then dialed the telephone without any help."[246] The ALJ found that this testimony was inconsistent with Mr. Washington's alleged limitations and found Mr. Washington's testimony not "specifically reliable."[247]

The ALJ concluded that Mr. Washington had the RFC to perform light work, subject to the following limitations: standing and walking six out of eight hours; no foot controls; no direct sunlight; no temperature extremes; no unprotected heights; no heavy equipment or operating machinery; no slippery or uneven surfaces; and no work requiring fine visual acuity or detail.[248] The ALJ found that Mr. Washington could perform simple, unskilled work that is learnable on short demonstration and which is routine.[249]

The ALJ continued his sequential analysis and determined that Mr. Washington was unable to perform any of his past relevant work as a dishwasher, landscape laborer, driver, cleaner/janitor, or garbage pickup worker. The ALJ concluded that Mr. Washington could not perform them because it was "unclear whether these jobs were performed at the level of substantial gainful activity as required to constitute past relevant work."[250]

The ALJ went on to consider whether Mr. Washington could perform other work. In determining whether a successful adjustment to other work can be made, the ALJ must consider a claimant's RFC, age, education, and work experience in conjunction with the Medical-

---

[244] R. at 974.
[245] *Id.*
[246] R. at 975.
[247] R. at 974-75.
[248] R. at 970.
[249] R. at 971.
[250] R. at 976.

Vocational Guidelines.[251] At the time of the alleged disability onset date, Mr. Washington was a forty-three year-old male, which is defined as a younger individual. Since the onset date, Mr. Washington has changed age category and is now considered closely approaching advanced age.[252] Mr. Washington has a high school education and was able to communicate in English.[253] Since the ALJ found that Mr. Washington's past relevant work was unskilled he did not discuss the transferability of job skills.[254] Considering Mr. Washington's age, education, work experience, and RFC, the ALJ found that there were jobs in significant numbers in the national economy that Mr. Washington could perform.[255]

Next, the ALJ considered Mr. Washington's ability to perform the requirements of light work, in light of his limitations and relied on the testimony of the VE.[256] The ALJ accepted the VE's conclusion that an individual with Mr. Washington's age, education, work experience, and RFC could perform the requirements of occupations such as an assembler, hand packer, and sorter.[257] The ALJ concluded that the VE's testimony was "consistent with the information contained in the Dictionary of Occupational Titles and Selected Characteristics of Occupations."[258] Based on this, the ALJ held that Mr. Washington was "not disabled because he was able to make "a successful adjustment to other work that exists in significant numbers in the national economy."[259]

---

[251] 20 C.F.R. Pt. 404, Subpt. P, App. 2.
[252] R. at 976.
[253] *Id.*
[254] *Id.*
[255] *Id.*
[256] R. at 977.
[257] DOT 701.687-010, DOT 559.687-074, and DOT 222.687-002.
[258] R. at 977.
[259] *Id.*

# III. STANDARD OF REVIEW

A reviewing court must sustain an ALJ's findings if they are supported by substantial evidence and free of legal error.[260] Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[261] To be supported by substantial evidence, the findings must be such that a reasonable mind might accept them as adequate to support the conclusion.[262] The standard of review is deferential, but the reviewing court must conduct a critical review, considering both evidence that supports and the evidence that detracts from the ALJ's decision.[263] If conflicting evidence allows reasonable minds to differ, the responsibility for determining whether a claimant is disabled falls upon the ALJ, not the reviewing court.[264] Although the ALJ need not address every piece of evidence or testimony presented, he must adequately discuss the issues and build an accurate and logical bridge from the evidence to the conclusion.[265] The court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.[266] The court will conduct a critical review of the evidence, and will not uphold the ALJ's decision if it lacks evidentiary support or an adequate discussion of the issues.[267]

# IV. ANALYSIS

Mr. Washington argues that the Commissioner's decision finding him not disabled should be reversed or remanded because the ALJ committed the following errors: (1) the ALJ failed to address the discrepancies between the VE's testimony, the Dictionary of Occupational Titles

---

[260] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).
[261] *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2001); *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).
[262] *Zurawski v. Halter*, 245 F.Ed 881 (7th Cir. 2001); *Richardson v. Perales*, 402 U.S. 389, 401.
[263] *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).
[264] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990); quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).
[265] *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).
[266] *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005).
[267] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

("DOT"), and Mr. Washington's RFC; (2) he failed to properly evaluate Mr. Washington's mental impairment under paragraph C of Listing 12.05; (3) he failed to properly consider Mr. Washington's need to elevate his legs; and (4) the ALJ 's hypothetical to the VE improperly excluded Mr. Washington's limitation in concentration, persistence, and pace. The Commissioner's general response to each of these arguments is that the ALJ's conclusions are supported by substantial evidence and that the issues raised by Mr. Washington are factual ones, which are best left to the ALJ's determination.

### A. The Discrepancies between the VE's Testimony, the DOT, and Mr. Washington's RFC.

In his hypothetical to the VE, the ALJ asked the VE to proffer potential jobs that Mr. Washington could perform based on the following limitations: work that is learnable on short demonstration, light functional capacity, not around unprotected heights, no heavy equipment, no operating machinery, no extreme temperatures, no excessive dust or fumes, not in direct sunlight, no slippery or uneven surfaces, and no foot controls. The ALJ accepted the VE's testimony that Mr. Washington could perform the requirements of an assembler, hand packager, and sorter as defined by the DOT.[268] These positions are listed in the DOT at 701.687-010, 559.687-074, and 222.687-022, respectively, and each has a specific vocational preparation level ("SVP") of 2.

An assembler is required to join parts to assemble articles using a "hammer, riveting machine, wrench or pneumatic screwdriver" and may also be required to use a drill press.[269] A hand packager is required to visually inspect products for damage, pack them into shipping cartons, and carry those cartons to a specified area.[270] A sorter, also known as a routing clerk or

---

[268] R. at 977.
[269] DOT 701.687-010.
[270] DOT 559.687-074.

router, is required to sort bundles of articles for delivery, read delivery slips, and determine the locations of addresses using charts.[271]

The ALJ offered an additional limitation of no fine visual acuity, to which the VE testified that the number of jobs would decrease. On cross-examination, however, the VE admitted that Mr. Washington could not work in these positions if he had "to hold things next to his face in order to see them properly."[272] Other limitations offered, such as the need to elevate his legs for several hours, the need to work at his own pace, requiring assistance to correct mistakes or finish work, also precluded Mr. Washington from these positions. Nonetheless, the ALJ concluded that Mr. Washington could perform the jobs listed by the VE.

Mr. Washington argues the ALJ erred in his analysis at step five because he improperly concluded that he could perform jobs that existed in the national economy. Mr. Washington asserts that there are inconsistencies between the VE's testimony, DOT, and Mr. Washington's RFC regarding the SVP levels of the positions offered by the VE. It is Mr. Washington's position that all of the positions offered by the VE required training beyond a short demonstration, which was one of the limitations identified by the ALJ in Mr. Washington's RFC.

The Commissioner argues that there are no inconsistencies between the VE's testimony, the DOT, and Mr. Washington's RFC and that the ALJ did not commit error by failing to inquire as to one. In regards to the different SVP levels, the Commissioner argues that Social Security Regulation 00-4p ("SSR 00-4p") does not limit Mr. Washington, who was determined to be able to perform unskilled work, to positions with SVP 1 and that there is no evidence that assembler, hand packer, and sorter jobs with an SVP level of 1 do not exist. The Commissioner concludes that any error made was harmless and is not grounds for remand.

_____

[271] DOT 222.687-022
[272] R. at 1041-42.

A position's SVP level indicates the amount of time required to learn how to perform to the job.[273] SSR 00-4p also characterizes SVP as the skill level required for a certain position.[274] Generally, the DOT's "regulatory definitions of skill levels are controlling."[275] Pursuant to SSR 00-4p, the ALJ has an affirmative obligation to ask the VE if any of her testimony "conflicts with information provided in the DOT."[276] If there is an inconsistency between the VE's testimony and the DOT, the ALJ is required to resolve the inconsistency and provide an explanation of "how he or she resolved the conflict."[277] The inconsistency must be resolved prior to the final determination of whether the claimant is disabled.[278] The failure of an ALJ to make such an inquiry is grounds for remand.[279]

In the case at bar, the ALJ concluded that Mr. Washington could perform unskilled work, with the limitation that the "work was learnable on short demonstration." The ALJ included this limitation in his initial hypothetical to the VE. The VE identified the positions of assembler, hand packer, and sorter. The ALJ did not ask her whether her testimony conflicted with the information in the DOT. Although unskilled work includes positions with SVP 1 and 2, all of the positions identified by the VE were SVP 2.[280] SVP 2 means "anything beyond short demonstration up to and including 1 month," whereas SVP 1 means "short demonstration only."[281]

Based on the explicit limitation that the work is learnable on short demonstration and the definitions of SVP 1 and 2, there is clearly an inconsistency between the positions offered by the

---

[273] DOT App. C.
[274] SSR 00-4p.
[275] *Id.*
[276] *Id.*
[277] *Id.*
[278] *Id.*
[279] *Prochaska v. Barnhart*, 454 F.3d 731, 735 (7th Cir. 2006).
[280] SSR 00-4p.
[281] DOT App. C.

VE and the limitations identified by the ALJ in his RFC analysis. Based on the plain language of the DOT, which defines SVP 1 as "short demonstration only" it appears that Mr. Washington could only perform positions that had an SVP level of 1 and no higher.

The Commissioner argues that it is possible, and asks this Court to assume, that there are assembler, hand packer, and sorter positions that could be performed at the level of SVP 1. However, such an assumption would be improper speculation on behalf of Court. It was the ALJ's obligation to inquire into this conflicting evidence and address it. The ALJ's failure to do so constitutes error.

Further, the Commissioner argues that any such error is harmless. This argument is also unavailing. A harmless error is one that the Court is confident would not impact the ultimate decision of disability.[282] That cannot be said about the ALJ's failure to inquire and address the conflict between the SVP level of the positions offered by the VE and the limitations identified in Mr. Washington's RFC.

There is nothing in the record that suggests to the Court that the positions identified by the VE could be performed on short demonstration only. The record reveals that a change in SVP level could either eliminate all work for Mr. Washington or simply change the number of positions available to him. For example, the VE testified that Mr. Washington's need to hold objects close to his face or work at his own pace would eliminate all work, whereas limitations regarding the time a person could stand or walk would only impact the number of positions available and not the type of work itself.[283] Therefore the Court is unwilling and unable to speculate with any certainty about the impact of the change in SVP level on the positions

---

[282] *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).
[283] R. at 1041-42.

35

available, if any, to Mr. Washington. The ALJ's failure to inquire and resolve the inconsistent evidence was not harmless error and is grounds for remand.

### B.  Mr. Washington's Mental Impairment

At step three of the five-step sequential analysis, the ALJ concluded that Mr. Washington did not have any impairments or combination of impairments that met or medically equaled an impairment listed in the regulations. Specifically, the ALJ found that there was no evidence to satisfy the requirements of paragraph C of listing 12.05.

Listing 12.05 and paragraph C of that listing state in relevant part:

Intellectual disability refers to significantly sub average general intellectual functioning    with deficits in adaptive functioning…severity for this disorder is met when…C. A valid verbal, performance, or full scale IQ of 60 through 70  and a physical or other mental impairment imposing an additional and  significant work-related limitation of function.

The ALJ hesitantly credited Mr. Washington's IQ score of 67, but did not believe that the record showed that Mr. Washington had "significant deficits in adaptive functioning as required in order to satisfy the listing."[284]

Mr. Washington contends that the ALJ erred when concluding that his mental impairment did not equal the mental impairment under paragraph C of Listing 12.05 because the evidence showed that his functioning has been impaired since high school, his IQ score is 67, and he suffers from eight other impairments recognized by the ALJ as severe. Mr. Washington points to the fact that he received special education services in high school, his grades were poor, and he was unsuccessful in the program he enrolled in at Oakton Community College. In regards to his work history, Mr. Washington points out that even the ALJ noted he was unable to keep a full time job.[285] Mr. Washington cites to Dr. Hakimi's testimony that he "does not appear to possess

---

[284] R. at 970.
[285] R. at 1040.

the skills necessary to live on his own."[286] In addition, Mr. Washington argues that he has poor hygiene and only showers two to three times a month.[287] Finally, Mr. Washington argues that it is inconsistent for the ALJ to find that he has eight severe impairments and then conclude that paragraph C of listing 12.05 has not been met.

In response, the Commissioner argues that Mr. Washington did not show that he satisfied paragraph C of listing 12.05 because he did not provide or identify a diagnosis of mental impairment and the record does not indicate one. The Commissioner argues that the ALJ's decision on this point is supported by the record and that Mr. Washington's argument merely goes to how the ALJ weighed the evidence, which is not a proper basis for remand or reversal.

The listings describe impairments that are considered to be presumptively disabling when specific criteria are met.[288] To meet or equal a listed impairment, a claimant must satisfy all of the criteria set forth in the listing.[289] The burden is on the claimant to show that his condition meets or equals a listed impairment.[290] In reviewing whether the ALJ erred in finding that Mr. Washington did not meet the requirements of paragraph C of listing 12.05, the Court must remain cognizant that it may not substitute its own judgment for the ALJ's on matters of credibility, weight of evidence, or conflicting evidence.[291]

In order to satisfy the requirements of paragraph C of listing 12.05, the claimant must show "sub average general intellectual functioning with deficits in adaptive functioning."[292] The severity required by the listing is met when there is evidence of an IQ score between sixty and seventy "and a physical or other mental impairment imposing an additional and significant

---

[286] R. at 1315.

[287] R. at 1314.

[288] 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.05(C).

[289] *Martz v. Astrue*, No. 1:07-CV-00219, 2008 WL 975051, *7 (N.D. Ind. April 8, 2008).

[290] *Id.*

[291] *Stark v. Astrue*, 278 Fed. Appx. 661 (7th Cir. 2008).

[292] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

work-related limitation of function."[293] Adaptive functioning refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.[294]

Mr. Washington focuses his arguments on the paragraph C requirements, without appreciating the fact that the ALJ must find a deficit in adaptive functioning prior to assessing whether the criteria of paragraph C had been met. The ALJ found that the evidence failed to demonstrate significant deficits in adaptive functioning because Mr. Washington had personal independence and seemed to be able to cope with common life demands.[295] The ALJ pointed to evidence in the record that Mr. Washington was currently independent in his daily activities, helped with household chores, and took care of his own personal needs, including checking his blood sugar two to three times a day.[296] Furthermore, the ALJ accorded weight to the medical professionals' independent statements that Mr. Washington had adequate grooming and good hygiene.[297] In regards to his social functioning, the ALJ determined that there were no deficits because Mr. Washington was able to take public transportation alone if he knew where he was going, and acknowledged taking the public bus and train.[298] Mr. Washington's own testimony supported the ALJ's conclusion because he testified that he ate out at restaurants with his mother[299] and drank socially with friends several days a week.[300] Based on a review of the record and the ALJ's explanations, the Court cannot concluded that the ALJ erred in finding that Mr. Washington did not demonstrate significant deficits in adaptive functioning.

---

[293] *Id.*
[294] *Id.*
[295] R. at 970.
[296] R. at 1316.
[297] R. at 1305.
[298] R. at 256.
[299] R. at 1317.
[300] R. at 774.

Even though he found that Mr. Washington did not have a deficiency in adaptive functioning, the ALJ went on to discuss why he believed the requirements of paragraph C were not met. Although Mr. Washington argues that the ALJ improperly discredited his IQ score of 67, the ALJ actually credited the IQ score of 67, but found it "questionable." The ALJ also found that Mr. Washington's impairments did not "impose an additional significant work-related limitation of function greater than reflected in his [RFC]." Here, it was perhaps error for the ALJ to summarily conclude that Mr. Washington did not suffer significant work-related limitations of functioning when he found eight of his impairments to be severe. The Court, however, finds that such an error was harmless in light of the fact that the ALJ's determination regarding Mr. Washington's adaptive functioning is supported by the record and both requirements must be satisfied in order to meet the listing. Accordingly, the Court finds that the ALJ did not commit error in concluding that Mr. Washington did not meet the requirements of paragraph C of listing 12.05.

### C.  Mr. Washington's Need to Elevate His Legs

In explaining his RFC determination and the limitations he recognized, the ALJ discredited Mr. Washington's need to elevate his legs because he testified that he could walk thirty blocks and operate a snow blower for a period of time.[301] Mr. Washington contends that the ALJ improperly excluded his need to elevate his legs from his RFC assessment and that his need to elevate his legs was supported by the medical evidence in the record. He cites as support for this argument numerous instances in the record that point to his difficulty with edema[302] and various medical reports, including doctors' instructions to elevate his legs.[303] Additionally, Mr. Washington notes that he was prescribed Hydrochlorothiazide, a diuretic used to treat

---

[301] R. at 975.
[302] R. at 219, 241, 302, 303, 305, 306, 308, 382, 742, 819, 830, 841, 1192, 1234, 1235, 1239, 1251, 1304.
[303] R. at 418, 1192, 1232.

symptomatic edema.[304] The Commissioner argues that the ALJ explicitly addressed Mr. Washington's need to elevate his legs and discredited the limitation because Mr. Washington testified to being able to walk thirty blocks.

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments.[305] "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence."[306]

In support of his argument, Mr. Washington cites to *Catchings v. Astrue*, a case in which the ALJ's RFC failed to properly address Plaintiff's allegation that he must elevate his legs when the VE testified that such a limitation would preclude all employment.[307] In that case, the ALJ's opinion was silent on whether the claimant needed to elevate his legs for any portion of his work day, and thus error was found.[308]

In the case at bar, however, the ALJ was not silent. The ALJ explicitly explained why he discredited Mr. Washington's allegation that he needed to elevate his legs. The ALJ stated that such an allegation was inconsistent with Mr. Washington's testimony that he could walk thirty blocks and operate a snow blower for an hour and a half. In addition, the ALJ stated that he gave substantial weight to the opinion of Dr. Martin, which included the finding that Mr. Washington's edema only required him to put up his feet for half an hour after work and that standing and walking would actually benefit his condition.[309] The ALJ sufficiently addressed and explained his reasoning for discrediting Mr. Washington's allegation regarding the need to

---

[304] R. at 1172, 1176, 1213, 1315, 1328.
[305] 20 C.F.R. § 404.1545(a).
[306] SSR 96-8p.
[307] *Catchings v. Astrue*, F.Supp.2d 1137, 1146 (N.D. Ill. 2011).
[308] *Id.*
[309] R. at 1023.

elevate his legs. Furthermore, the ALJ's conclusion on this issue is supported by substantial evidence in the record and the Court does not find that the ALJ erred.

### D. Mr. Washington's Limitations in Concentration, Persistence, and Pace

The ALJ concluded that Mr. Washington had "moderate difficulties"[310] in concentration, persistence, and pace. In his hypothetical questions to the VE, the ALJ asked the VE to limit available positions to those that were "learnable on a short demonstration." Based on the limitations provided in the ALJ's hypothetical the VE concluded that Mr. Washington could perform the positions of assembler, hand packager, and sorter positions.[311]

Mr. Washington argues that the ALJ erred by failing to include Mr. Washington's limitations in concentration, persistence, and pace in his hypothetical questions to the VE and therefore the VE's testimony and conclusions did not take into consideration all of his limitations. It is Mr. Washington's position that it was not enough for the ALJ to include the limitation of work that is "learnable on short demonstration" and that the ALJ had to do more. Mr. Washington points to evidence in the record to support the conclusion that he is has limitations in the areas of concentration, persistence, and pace. The Commissioner argues that the ALJ's hypothetical questions to the VE did include Mr. Washington's limitations in these areas because the ALJ asked the VE to limit positions to those that were "learnable on short demonstration."[312]

To the extent that the ALJ relies on testimony from a VE, the hypothetical questions must incorporate all relevant limitations from which the claimant suffers, which in the case at bar would include the ALJ's conclusion that Mr. Washington had moderate difficulties in

---

[310] R. at 969.
[311] R. at 1037-38.
[312] R. at 1036.

concentration, persistence, and pace.[313] When a hypothetical question is flawed because it lacks the limitations the ALJ has determined exist based on his review of the records in evidence, the ALJ's decision that a claimant can find work in the national economy cannot stand. [314]

The Commissioner cites to *O'Connor-Spinner v. Astrue* for the proposition that an ALJ is allowed some leeway in how he poses hypotheticals to address a claimant's limitations in concentration, persistence or pace.[315] The court held that "the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical" and that "alternative phrasing [must] specifically exclude those tasks that someone with the claimant's limitations would be unable to perform." [316] The court also noted that using phrases like "'simple, repetitive tasks,'" in hypothetical questions does not necessarily incorporate limitations in concentration, persistence or pace.[317]

In the present matter, the ALJ's initial hypothetical to the VE asked the VE to consider someone who was limited to unskilled work that was learnable on short demonstration, routine, and did not change day-to-day.[318] To which the VE responded that such a person could perform the jobs of assembler, hand packer, and sorter.[319] The ALJ then went on and explicitly asked the VE about limitations in pace. The ALJ asked, "…By performance expectations, I mean he can only work at his own pace, not at a pace assigned by an employer…How would that impact the likelihood that he's doing one of these jobs?"[320] To which the VE responded, "It would impact it greatly, [y]our Honor. There would be no substantial gainful activity with that performance

[313] *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003).
[314] *Young v. Barnhart*, 362 F.3d 995 (7th Cir. 2004).
[315] *O'Connor-Spinner v. Astrue,* 627 F.3d 614, 619 (7th Cir. 2010).
[316] *Id.*
[317] *Id.* at 620.
[318] R. at 1036.
[319] R. at 1037.
[320] R. at 1039.

expectation within the hypothetical."[321] The ALJ followed-up with, "[What if] other people have to assist him as far as correcting mistakes or telling him to finish work, any impact?"[322] To which the VE responded, "Yes, [y]our Honor. That would not be consistent with competitive employment if that's happening on a consistent basis…If an individual has to consistently receive help and/or refocusing or, and supervision…"[323]

Contrary to Mr. Washington's argument, the ALJ addressed Mr. Washington's limitations in concentration, persistence, and pace. Although the ALJ only explicitly used the word pace in his hypothetical questions to the VE, they still incorporated Mr. Washington's limitations in these areas. Mr. Washington argues that the hypothetical posed did not consider his "'slow and cautious style,'" that he "'works slowly,'" makes errors because of "'lapses in concentration that require him to retrace his steps,'" or "'tries hard but rarely completes assignments.'"[324] However, this is exactly what the second part of the ALJ's hypothetical to the VE considered. The Court concludes that the ALJ's hypothetical to the VE properly included considerations for Mr. Washington's moderate difficulties in concentration, persistence, and pace.

## V.    CONCLUSION

For the reasons set forth above, Mr. Washington's motion to reverse the Commissioner's final decision is granted and this case is remanded to the agency for further proceedings consistent with this opinion.

**ENTERED:** **May 21, 2014**

_____
  **UNITED STATES MAGISTRATE JUDGE**
  **Susan E. Cox**

---

[321] *Id.*
[322] R. at 1039-40.
[323] R. at 1040.
[324] Pl. Mem. in Supp., Dkt. 25.